***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence affirms with modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. It is stipulated that all parties are properly before the Commission, and the Commission has jurisdiction of the parties and of the subject matter.
2. It is stipulated that all parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. It is stipulated that where documents are to be entered as evidence or produced pursuant to subpoena, photocopies of said documents produced by the party in possession of the original shall be acceptable.
4. In addition to the other stipulations set forth above, the parties stipulate and agree with respect to the undisputed facts as follows: (a) on May 17, 2002, an employment relationship existed between plaintiff-employee and defendant-employer Thor-Lo, Inc., and the parties are bound by and subject to the North Carolina Workers' Compensation Act; (b) defendant-carrier The Hartford was the workers' compensation insurance carrier for Thor-Lo, Inc. on May 17, 2002; and (c) plaintiff's average weekly wage at the time of her injury was $540.35, yielding a compensation rate of $360.25.
5. The following exhibits were admitted: (a) plaintiff's medical records; (b) a February 24, 2003 note from Dr. Burrows assigning plaintiff a permanency rating; (c) plaintiff's medical bills including amounts owed and paid out of pocket by plaintiff; and (d) plaintiff's W2.
 ***********
Based upon the foregoing Stipulations and the evidence presented, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 31 years old. Plaintiff began working with defendant-employer in February 1998 and continued to work for defendant-employer at the time of the hearing before the deputy commissioner as a modular operator/knitter throughout her employment with defendant-employer. Plaintiff's job duties included running seven to eight machines that made socks. Plaintiff worked twelve-hour shifts with a thirty-minute lunch and two ten-minute breaks plus a six-hour extra shift. She averages 42 hours per week. The sock machines run constantly. During the process, socks come out of the machine into a basket. Plaintiff retrieves each sock out of the basket, pulls the sock over her right hand and inspects it with her left hand. She turns the socks inside out and stacks them on her shoulder. Plaintiff then seams the toe of each sock using a sewing machine. She again stretches the sock to inspect it. She is required to lift cones of yarn weighing ten to fifteen pounds to creel the machines. Plaintiff's job requires repetitive use of her arms and hands, and plaintiff engages in no hobbies or sporting activities that require repetitive motion of her arms and hands.
2. On May 17, 2002, while performing her duties at work, plaintiff began experiencing severe pain in her left hand and arm that hurt all the way into her neck and chest. She reported this pain to her supervisor, and was referred to the Iredell Memorial Hospital emergency room, where there was some concern that she might be having a heart problem. The plaintiff was evaluated for a cardiac problem, which was ruled out.
3. As a result of her left hand problems, plaintiff was out of work from May 17, 2002 to September 30, 2002. During this period, plaintiff received short-term disability benefits through an employer-funded plan in the total amount of $5,518.76.
4. On May 20, 2002, plaintiff presented to her family physician, Dr. Ronald Benfield. Dr. Benfield suspected carpal tunnel syndrome but was unable to diagnose that condition with certainty. Thereafter, plaintiff was sent to Dr. Warren Burrows, an expert in the field of hand surgery.
5. Plaintiff presented to Dr. Burrows on June 6, 2002. At that time, Dr. Burrows was of the opinion that plaintiff had possible left-sided carpal tunnel syndrome. On June 13, 2002, nerve conduction studies revealed indications of early or minimal carpal tunnel syndrome. Plaintiff was given a wrist splint, prescribed anti-inflammatories and taken out of work. On June 16, 2002, Dr. Burrows returned plaintiff to work with severe restrictions, including a weight lifting limit of two pounds with the left extremity.
6. On July 8, 2002, Dr. Burrows diagnosed plaintiff with neuropraxia, an irritation of the nerve and tendonitis, an inflammation of the tendon. Dr. Burrows was of the opinion that plaintiff did not need surgery for these conditions.
7. Dr. Burrows visited defendant-employer's plant where plaintiff is employed and observed people doing plaintiff's job. Dr. Burrows also viewed a videotape of plaintiff performing her job duties. Dr. Burrows opined that plaintiff's job required wrist motion on a fairly rapid basis, and that her job was moderately repetitive and put her at an increased risk of developing tendonitis and neuropraxia than members of the general public not so employed.
8. Dr. Burrows opined that plaintiff's neuropraxia and tendonitis were caused or significantly contributed to by her job as a modular operator.
9. Plaintiff continued to treat with Dr. Burrows in July, August and September of 2002. She was restricted to light duty and received a carpal tunnel injection and non-steroidal anti-inflammatories. On August 19, 2002, plaintiff's medication was changed from Celebrex to Bextra. On September 5, 2002, plaintiff reported that her symptoms had improved following the change to Bextra. On September 23, 2002, plaintiff continued to have improving symptoms, and Dr. Burrows returned her to work full duty on September 30, 2002.
10. On October 17, 2002, plaintiff presented to Dr. Burrows after having worked at regular duty for several weeks. At that time plaintiff had increased swelling, but Dr. Burrows continued her on regular duties and Bextra.
11. Dr. Burrows opined that on February 24, 2003, plaintiff reached maximum medical improvement and retained a 5% permanent partial impairment rating of the left hand.
12. From May 17, 2002 to September 30, 2002, plaintiff received disability payments. However, the deduction to which defendants are entitled should be reduced by $496.85 as F.I.C.A. payments were deducted from these disability payments.
13. As defendants did not accept plaintiff's claim, they did not pay workers' compensation benefits to plaintiff. Thus, when plaintiff was out on disability, plaintiff was required to pay defendants the amount of $926.56 so that defendants would maintain her medical insurance benefits during her disability leave. Any deduction to which defendants are entitled for disability payments through disability insurance should be reduced by the $926.56 plaintiff was required to pay to maintain her medical insurance.
14. On May 17, 2002, plaintiff contracted neuropraxia and tendonitis of the left hand.
15. Plaintiff's job as a modular operator/knitter caused and/or significantly contributed to the development of her neuropraxia and tendonitis.
16. Plaintiff's work for defendant-employer as a modular operator/knitter placed her at a greater risk of developing neuropraxia and tendonitis, occupational diseases, than members of the general public not engaged in this occupation.
17. As a result of the work-related neuropraxia and tendonitis, plaintiff was unable to work and earn wages in any capacity for defendant or any other employer from May 17, 2002 through and including September 30, 2002.
18. Defendant-employer paid short-term disability benefits to plaintiff in the amount of $5,518.76 for this period. These benefits were funded fully by defendants. Defendants are entitled to a deduction of these payments. However, the deduction to which defendants are entitled should be reduced by payments which plaintiff was required to make pursuant to those disability payments for which she would not have been liable had defendants provided workers' compensation coverage; to wit, $496.85 for F.I.C.A. payments deducted from plaintiff's disability payments and $926.56 which plaintiff was required to pay to maintain her medical insurance benefits during the time of her work-related disability.
19. At the time of her injury, plaintiff's average weekly wage was $540.35, yielding a compensation rate of $360.25.
20. For her occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $360.25 for the period from May 17, 2002 through and including September 30, 2002.
21. On February 24, 2003, plaintiff reached maximum medical improvement, and retained a 5% permanent partial impairment of the left hand. For her 5% permanent partial disability of the left hand, plaintiff is entitled to ten weeks of permanent partial disability compensation at the rate of $360.25 per week.
22. Plaintiff is entitled to have defendants provide all medical compensation arising from plaintiff's occupational disease, including payment for the services of Iredell Memorial Hospital emergency room, Dr. Benfield and Dr. Burrows.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On May 17, 2002, plaintiff contracted neuropraxia and tendonitis of the left hand, which are occupational diseases within the meaning of N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's job as a modular operator/knitter caused and/or significantly contributed to the development of her neuropraxia and tendonitis. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff's work for defendant-employer as a modular operator/knitter placed her at a greater risk of developing neuropraxia and tendonitis than members of the general public not engaged in this occupation. N.C. Gen. Stat. § 97-53(13).
4. As a result of the work-related neuropraxia and tendonitis, plaintiff was unable to work and earn wages in any capacity for defendant or any other employment from May 17, 2002 through and including September 30, 2002. N.C. Gen. Stat. § 97-29.
5. Defendant-employer paid short-term disability benefits to plaintiff in the amount of $5,518.76 for the period from May 17, 2002 through September 30, 2002. These benefits were funded fully by defendants. Defendants are entitled to a credit for these payments. However, the credit to which defendants are entitled should be reduced by payments which plaintiff was required to make pursuant to those disability payments for which she would not have been liable had defendants provided workers' compensation coverage; to wit, $496.85 for F.I.C.A. payments deducted from plaintiff's disability payments and $926.56 which plaintiff was required to pay to maintain her medical insurance benefits during the time of her work-related disability. N.C. Gen. Stat. § 97-42.
6. At the time of her injury, plaintiff's average weekly wage was $540.35, which yields a compensation rate of $360.25. N.C. Gen. Stat. §97-2(5).
7. Plaintiff is entitled to temporary total disability compensation at the rate of $360.25 for the period from May 17, 2002 through and including September 30, 2002. N.C. Gen. Stat. § 97-29.
8. On February 24, 2003, plaintiff reached maximum medical improvement, and plaintiff retains a 5% permanent partial impairment of the left hand. Plaintiff is therefore entitled to ten weeks of permanent partial disability compensation at the rate of $360.25 per week. N.C. Gen. Stat. § 97-31.
9. Defendants are obligated to provide all medical compensation arising from plaintiff's occupational disease, including payment for the services of Iredell Memorial Hospital emergency room, Dr. Benfield and Dr. Burrows. N.C. Gen. Stat. § 95-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $360.25 per week from May 17, 2002 through and including September 30, 2002. This amount has accrued and shall be paid in a lump sum, subject to the attorney fee approved in Paragraph 4 of this Award.
2. Defendants shall pay compensation to plaintiff for permanent partial disability at the rate of $360.25 per week for a period of ten weeks for the 5% rating to her left hand. This amount shall be paid subject to the attorney's fee approved in Paragraph 4 of this Award.
3. Subject to the attorney's fee awarded in paragraph 4 of this award, defendants shall receive a credit against the remaining compensation owed to plaintiff for the short-term disability plaintiff received under a policy wholly funded by defendant-employer. This deduction shall be reduced by the $496.85 for F.I.C.A. and $926.56 for medical insurance continuation, which was paid by plaintiff. Defendant's credit shall be calculated from payments made by the employer in each week during which compensation was due and payable without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff prior to deduction for defendants' credit is hereby approved for plaintiff's counsel and shall be deducted and paid by defendants directly to plaintiff's counsel.
5. Defendants shall pay all medical expenses incurred by plaintiff as a result of her occupational disease.
6. Defendants shall pay the costs.
This the ___ day of November 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER